# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
### CIVIL NO. 3:08CV608-RJC-DSC

| | | |
|---|---|---|
| GEORGE KARSKI, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | |
| | ) | **MEMORANDUM AND RECOMMENDATION** |
| | ) | **AND ORDER** |
| BRAZILIAN RESOURCES, INC., | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on Defendant's "Motion to Dismiss ... Amended Complaint ..." (document #15) and "Memorandum in Support ..." (document #15-1), both filed March 9, 2009; the pro se Plaintiff's "... Response ..." (document #18) filed March 23, 2009; the pro se Plaintiff's "Motion for Leave to File [Second] Amended Complaint" (document #19) and "Memorandum in Support ..." (document #20), both filed March 25, 2009; and the Defendant's "Memorandum ... in Opposition to ... Motion for Leave to File [Second] Amended Complaint" (document #22) filed April 13, 2009.

On April 1 and 24, 2009, respectively, Defendant and Plaintiff filed their "Reply ..." briefs. See Documents ## 21 and 23.

This matter was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), and these Motions are now ripe for the Court's consideration.

Having fully considered the arguments, the record, and the applicable authority, the undersigned will deny the Plaintiff's Motion for Leave to file a Second Amended Complaint and,

further, will respectfully recommend that the Defendant's Motion to Dismiss be <u>granted</u>.

## I. PROCEDURAL AND FACTUAL BACKGROUND

For four months in 2001, and intermittently between 2003 and 2008, Plaintiff George Karski ("Plaintiff") worked as a consultant to Defendant Brazilian Resources, Inc. ("Defendant" or "BZI") on a project to establish a food irradiation network in Brazil to be owned by a BZI subsidiary.

According to the allegations contained in the Amended Complaint, which are taken as true at this stage in the proceedings, on May 10, 2001, the parties executed a consulting letter of intent (the "2001 LOI") which states that the parties were "considering entering into a relationship" to manage and develop an entity, then called "Securefoods Corporation," that would be formed "for the sole purpose of the development of the irradiation business in Brazil." The 2001 LOI states that Plaintiff would serve as an outside consultant to the project "until such time as Securefoods is fully operational." Plaintiff was to be compensated through contingent monthly consulting fees of $5,000 which would accrue until Securefoods capitalized the first of five planned irradiation units. The fees would not be owed at all if the business failed "to move forward." The 2001 LOI also outlined compensation Plaintiff would receive if and when the business did "move forward," to include a "package of stock" in Securefoods in an unspecified amount, "subject to the performance of Securefoods." The 2001 LOI stated that the terms of the consulting arrangement would be in effect for 90 to120 days, at which time they would be incorporated into a separate consulting contract.

Plaintiff further alleges that soon after the execution of the 2001 LOI, he became disgruntled with the irradiation project, allegedly as a result of the Defendant's delay in providing him with a consulting contract. In or about August 2001, Plaintiff informed the Defendant that he would not

have any further involvement in the venture.

Plaintiff maintains, however, that approximately 18 months later in February 2003, the parties resumed discussions regarding the irradiation project, which led to the execution of a second letter of intent (the "2003 LOI"). The 2003 LOI was executed by the Defendant on June 9, 2003, and by Plaintiff on June 10, 2003. As the 2003 LOI reflects, the irradiation project was still in its embryonic stage. The parties had not developed a business plan or obtained capital to fund the project, and the BZI subsidiary that was to own the irradiation network – now described as "SecureFoods, Inc." – was not even close to commencing operations.

The 2003 LOI further states that the parties intended to collaborate to "develop[ ] a Brazilian based irradiation network and worldwide marketing program." To achieve this objective, the parties agreed to develop a "comprehensive business plan" that would be used to raise capital and would include, among other things, an outline of the project's goals and objectives, a capital plan, and contracts and agreements formalizing the parties' respective roles and compensation.

The 2003 LOI describes, in a manner consistent with the 2001 LOI, the consulting services to be provided by Plaintiff and the role to be played by the Defendant. As compensation for their respective contributions, Plaintiff would receive a 40% interest of the "operating entity," identified "for discussion purposes" in the 2003 LOI as "SecureFoods, Inc.," and the Defendant would receive the remaining 60% interest in the operating entity. The 2003 LOI states that distribution of shares in the operating entity would be accomplished through a "shareholder's agreement" to be prepared after the parties had completed the business plan and concluded the capital program needed to fund the project. The 2003 LOI also states that the parties' respective percentages of ownership in the operating entity would be diluted "as capital is raised and shares sold to market."

In early 2004, before the parties completed the business plan and capital program required under the 2003 LOI and prior to the distribution of stock in the operating entity, they attempted to bring three additional parties into the project: Dirceau Martins Vizeu ("Vizeu"), Francisco Marques ("Marques"), and Embrarad, a Brazilian company owned by Vizeu. On February 2, 2004, the Defendant forwarded to Plaintiff a draft shareholders' agreement (the "Draft Shareholders' Agreement"). The Draft Shareholders' Agreement stated that the Defendant then still owned "100% of the issued and outstanding shares of" SecureFoods, Inc., and that the stock was to be divided four ways in light of the participation of the additional parties: Plaintiff would own 15%, Embrarad and Marques would own 10% and 5%, respectively, and the remaining 70% would be owned by Defendant. Ultimately, Vizeu, Marques and Embrarad did not participate in the project. The parties did not execute the Draft Shareholders' Agreement or distribute stock in SecureFoods, Inc., as contemplated by that Agreement or the 2003 LOI.

Plaintiff alleges that the plan for him to receive stock in the Defendant corporation arose after the project milestones set forth in the 2003 LOI were delayed when the irradiation project encountered regulatory and marketing problems. On December 30, 2005, the parties entered into a one-year consulting agreement (the "2005 Consulting Agreement") and a restricted stock agreement (the "2005 Stock Agreement") which restructured the basis of Plaintiff's compensation for his consulting services by granting him an immediate interest in the Defendant corporation rather than a future interest in SecureFoods, Inc. Both the 2005 Consulting Agreement and the 2005 Stock Agreement provide that their terms "will be governed by and construed in accordance with the laws of New Hampshire."

As the Defendant points out in its briefs, Section 2 of the 2005 Consulting Agreement

addresses Plaintiff's compensation for his consulting services, stating that Plaintiff would receive

"no cash compensation for his services," which are described in terms consistent with those set forth

in the 2001 LOI and 2003 LOI. Rather, it provides that "[i]n consideration of the Services and

Consultant's covenants in Section 4 of this Agreement, [BZI] shall issue 1,250,000 shares of [BZI's]

stock."

The Consulting Agreement also contained an integration clause which states unambiguously

that this Agreement supersedes all other oral or written agreements between the parties with respect

to Plaintiff's consulting services, as follows:

> This Agreement and the Restricted Stock Agreement supersede any and all
> agreements, either oral or written, between the parties hereto with respect to the
> performance of Services by Consultant for Company and contain all the covenants
> and agreements between the parties with respect to the performance of such Services
> in any manner whatsoever. Each party to this Agreement acknowledges that no
> representations, inducements, promises, or agreements, orally or otherwise, have
> been made by any party, or anyone acting on behalf of any party, which are not
> contained herein, and that no other agreement, statement, or promise not contained
> in this Agreement or the Restricted Stock Agreement shall be valid or binding. Any
> modification of this Agreement will be effective only if it is in writing signed by each
> party.

Similarly, the 2005 Stock Agreement provides that "in consideration of" Plaintiff's

consulting services, he would be compensated through the issuance of 1,250,000 shares of the

Defendant's stock. The Stock Agreement also states that one-third of the shares would vest on

December 30, 2005, one-third would vest on June 30, 2006, and one-third would vest at the end of

the one-year consulting period on December 30, 2006. There is no dispute that the Plaintiff

received and continues to own these shares of Defendant's stock.

As in the Consulting Agreement, the Stock Agreement contained an integration clause which

provides as follows:

Entire Agreement:  This Agreement and the [Consulting] Agreement constitute the entire agreement and understanding of the parties hereto concerning the subject matter hereof and from and after the date of this Agreement, this Agreement shall supersede any other prior negotiations, discussions, writings, agreements, or understandings, both written and oral, between the parties with respect to such subject matter.

The Consulting Agreement expired on December 30, 2006.  Nearly a year later, on December 19, 2007, after Defendant issued a letter to shareholders stating that SecureFoods, Inc. was 100% owned by the Defendant, Plaintiff emailed the Defendant alleging that the press release was incorrect because "in 2003 [BZI President] Dan [Titcomb] and I agreed that in addition to the BZI shares I received, I would retain a 40% participation in SecureFoods.  Dan and I shook hands and exchanged documents on the arrangement."  By reply email that same date, the Defendant responded it was unaware of any such agreement and requested Plaintiff to forward copies of the "exchanged documents."  A short time later, Plaintiff forwarded copies of a draft of the 2003 LOI, dated June 6, 2003, and the final 2003 LOI, dated June 9, 2003.

On December 29, 2008, the Plaintiff,  proceeding pro se,  filed his initial  Complaint.   On January 21, 2009, before the Defendant's Answer or other response to the Complaint was due,[1] the Plaintiff filed his Amended Complaint which asserted claims for breach of contract (Count I), misrepresentation or fraud (Count II), and intentional or negligent infliction of emotional distress (Count III).  The essential contention of those claims is that Plaintiff was entitled to receive the 1,250,000 shares of the Defendant's stock and a 40% ownership stake in the Defendant's subsidiary SecureFoods, Inc.

On March 9, 2009, the Defendant filed its Motion to Dismiss the Amended Complaint,

---

[1]  Rule 15(a)(1)(A) of the Federal Rules of Civil Procedure provides that "[a] party may amend its pleading once as a matter of course: before being served with a responsive pleading...."

contending, among other things, that Plaintiff's breach of contract claim, that is, his claim to receive

40% of SecureFoods, Inc. under the terms of the 2003 LOI, is barred by the integration clauses

contained in the subsequent 2005 Consulting and Stock Agreements. Defendant further contends that

the Plaintiff has otherwise failed to plead sufficient facts to support his misrepresentation/fraud and

infliction of emotional distress claims.

In his one-page Response, filed March 23, 2009, Plaintiff offered no opposition to the

Defendant's Motion to Dismiss the Amended Complaint, and, instead, stated only that he would

"submit[] a Motion for Leave to file an Amended Complaint to conform with Fed. R. Civ. P.

12(b)(6) to clearly state his claims."

On March 25, 2009, the Plaintiff filed his Motion for Leave to file a Second Amended

Complaint.   In his Motion and proposed Second Amended Complaint, Plaintiff alleges only two

claims – for unjust enrichment and fraud – and has abandoned his breach of contract and emotional

distress claims.

The facts Plaintiff wishes to plead in his Second Amended Complaint are substantially

similar, if not identical, to the allegations of the Amended Complaint, with two exceptions.  First,

the proposed Second Amended Complaint alleges that on April 19, 2001, the Defendant indicated

to a potential investor, Ionworks, LLC, that Plaintiff "was to be excluded from the final structure of

the deal."   To support this allegation, Plaintiff has proffered an unattested letter purportedly written

by a long-time friend of Plaintiff's, Arthur Harrington. ____

Second,  in  the  proposed  Second  Amended  Complaint,  Plaintiff  has  changed  his

characterization of the 2003 LOI and the events surrounding the execution of that document.  While

the original Complaint alleged that the 2003 LOI "outlin[ed] plaintiff's 40 percent ownership interest

7

in SecureFoods, Inc. and consulting agreement with compensation of 1,000,000 shares of Brazilian Resources Inc,." Plaintiff eliminated this allegation from the First Amended Complaint, and instead alleged that at the time of the 2003 LOI, the parties agreed they would later execute a separate agreement reflecting "plaintiff's shareholder participation." In the proposed Second Amended Complaint, Plaintiff has revised his story again, and now alleges that when the final version of the 2003 LOI was faxed to him on June 9, 2003, it was to "include a dilution schedule" that would address Plaintiff's purported interest in BZI, but "due to a facsimile machine jam" the dilution schedule was never provided to him. As the Defendant points out, a complete copy of the executed 2003 LOI is in the record and contains no "dilution schedule."

The parties' Motions have been fully briefed and are, therefore, ripe for disposition.

## II. DISCUSSION

### A. Motion to Dismiss Amended Complaint

"A motion to dismiss under [Fed. R. Civ. P. 12(b)(6)] tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of North Carolina v. Martin, 980 F.2d 943, 952 (4th Cir.), cert. denied, 510 U.S. 828 (1993), citing 5A C. Wright & A. Miller, Fed. Practice and Procedure §1356 (1990).

As a general rule, a plaintiff's complaint need only provide a short statement in plain English of the legal claim showing that the pleader is entitled to relief that is also sufficient to provide the defendant with "fair notice" of the claim and its basis. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal quotation marks omitted); Fed. R. Civ. P. 8(a)(2). In order to survive a motion

to dismiss, however, the pleader must show through her allegations that it is plausible, rather than merely speculative, that she is entitled to relief. Twombly, 550 U.S. at 555-56. A complaint must do more than merely "avoid foreclosing possible bases for relief; it must actually suggest that the plaintiff has a right to relief, by providing allegations that raise a right to relief above the speculative level." Tamayo v. Blagojevich, 526 F.3d 1074, 1084 (7th Cir. 2008) (internal quotation marks omitted).

In considering a Rule 12(b)(6) motion, the complaint must be construed in the light most favorable to the nonmoving party, assuming factual allegations to be true. See, e.g., Hishon v. King & Spaulding, 467 U.S. 69, 73 (1984); Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993); Martin Marietta v. Int'l Tel. Satellite, 991 F.2d 94, 97 (4th Cir. 1992); and Revene v. Charles County Comm'rs, 882 F.2d 870, 872 (4th Cir. 1989).

Plaintiff has not opposed Defendant's Motion to Dismiss his Amended Complaint, but instead seeks to substitute a Second Amended Complaint. Accordingly, for the reasons stated in its "Memorandum in Support ..." (document #15-1), the undersigned will respectfully recommend that Defendant's Motion to Dismiss the Amended Complaint be granted. The remaining issue is whether Plaintiff is entitled to prosecute the claims stated in his proposed Second Amended Complaint, discussed below.

### B. Motion for Leave to File Second Amended Complaint

#### 1. Standard of Review

The Fourth Circuit has stated that "under Rule 15(a) leave to amend shall be given freely, absent bad faith, undue prejudice to the opposing party, or futility of amendment." U.S. v. Pittman,

209 F.3d 314, 317 (4th Cir. 2000) (emphasis added).   Further, "the grant or denial of an opportunity to amend is within the discretion of the District Court." Pittston Co. v. U.S., 199 F.3d 694, 705 (4th Cir. 1999).

### 2. Unjust Enrichment

Taking the facts alleged in the proposed Second Amended Complaint as true, the parties clearly entered into one or more express contracts which govern the terms and conditions of their agreement.   Under those circumstances, and regardless of whether North Carolina or New Hampshire law is applied, Plaintiff's purported unjust enrichment claim is futile.   In both states, an unjust enrichment claim lies only in the absence of a valid express contract.   See Whitfield v. Gilchrist, 348 N.C. 39, 42, 497 S.E.2d 412, 415 (1998) ("[o]nly in the absence of an express agreement of the parties will courts impose a quasi contract or a contract implied in law in order to prevent an unjust enrichment"); Lagies v. Myers, 142 N.C.App. 239, 254, 542 S.E.2d 336, 345-46 (2001) (applying Whitfield); and Cohen v. Frank Developers, 118 N.H. 512, 518 (1978) (a claim for unjust enrichment/quantum meruit will not lie where a valid contract governs the terms and conditions of an agreement between two parties).

### 3. Fraud

In order to state a claim for fraud under North Carolina law, a plaintiff must allege the following essential elements: "(1) a false representation or concealment of a material fact, (2) that was reasonably calculated to deceive, (3) which was made with the intent to deceive, (4) that did in fact deceive, and (5) resulted in damage." Breeden v. Richmond Community College, 171 F.R.D.

189, 194 (M.D.N.C. 1997).  See also Fed. R.Civ. P. 9(b); and  Liner v. DiCresce, 905 F.Supp. 280, 288 (M.D.N.C. 1994), citing Myers & Chapman, Inc. v. Thomas G. Evans, Inc., 323 N.C. 559, 563, 374 S.E.2d 385, 390 (1988).  New Hampshire law is similar. First, "to establish fraud, a plaintiff must prove that the defendant made a representation with knowledge of its falsity or with conscious indifference to its truth with the intention to cause another to rely upon it." Snierson v. Scruton, 145 N.H. 73, 77 (2000), citing Patch v. Arsenault, 139 N.H. 313, 319 (1995)).  Thereafter, a plaintiff must establish justifiable reliance on the representations.  Gray v. First New Hampshire Banks, 138 N.H. 279, 283 (1994).  Finally, a plaintiff must "specifically allege the facts of the defendant's fraudulent actions." Proctor v. Bank of New Hampshire, 123 N.H. 395, 399 (1983); see also Belisle v. Belisle, 88 N.H. 459 (1937) (alleging fraud in general terms is insufficient).

Plaintiff's proposed Second Amended Complaint fails to allege an actionable fraud claim under North Carolina or New Hampshire law.  By incorporating executed copies of the parties' contracts in his successive Complaints, Plaintiff's pleadings establish that although the parties initially agreed that Plaintiff would receive an ownership position in the subsidiary, SecureFoods, Inc., they later agreed that the Plaintiff would receive 1,250,000 shares of stock in the parent corporation, BZI, instead.  Plaintiff's belated allegation that Defendant told a potential investor that the Plaintiff would be "excluded from the deal" – when the Plaintiff, in fact, received 1,250,000 shares of stock – is simply inadequate to support a claim of fraud.

Having concluded that Plaintiff's proposed  amendments are futile, the Court will exercise its discretion and deny the Plaintiff's Motion for Leave to file yet another Amended Complaint.

## III. ORDER

**IT IS HEREBY ORDERED** that:

1. The Plaintiff's "Motion for Leave to File [Second] Amended Complaint" (document #19) is **DENIED**.

2. All further proceedings in this action, including <u>all</u> discovery, are **STAYED** pending the District Court's ruling on this Memorandum and Recommendation and Order.

## IV. RECOMMENDATION

**FOR THE FOREGOING REASONS,** the undersigned respectfully recommends that the Defendant's "Motion to Dismiss ... Amended Complaint ..." (document #15) be **GRANTED** and that the Amended Complaint be **DISMISSED WITH PREJUDICE.**

## V. NOTICE OF APPEAL RIGHTS

The parties are hereby advised that, pursuant to 28 U.S.C. §636(b)(1)(c), written objections to the proposed findings of fact and conclusions of law and the recommendation contained in this Memorandum must be filed within ten (10) days after service of same. <u>Page v. Lee</u>, 337 F.3d 411, 416 n.3 (4th Cir. 2003); <u>Snyder v. Ridenour</u>, 889 F.2d 1363, 1365 (4th Cir. 1989); <u>United States v. Rice</u>, 741 F. Supp. 101, 102 (W.D.N.C. 1990). Failure to file objections to this Memorandum with the District Court constitutes a waiver of the right to <u>de novo</u> review by the District Court. <u>Diamond v. Colonial Life</u>, 416 F.3d 310, 315-16 (4th Cir. 2005); <u>Wells v. Shriners Hosp.</u>, 109 F.3d 198, 201 (4th Cir. 1997); <u>Snyder</u>, 889 F.2d at 1365. Moreover, failure to file timely objections will also

preclude the parties from raising such objections on appeal.  Diamond, 416 F.3d at 316; Wells, 109

F.3d at 201; Page, 337 F.3d at 416 n.3; Thomas v. Arn, 474 U.S. 140, 147 (1985); Wright v. Collins,

766 F.2d 841, 845-46 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).


The Clerk is directed to send copies of this Memorandum and Recommendation and Order

to the pro se Plaintiff, to counsel for the Defendant; and to the Honorable Robert J. Conrad, Jr.


**SO ORDERED AND RECOMMENDED.**


Signed: May 4, 2009

David S. Cayer
United States Magistrate Judge